Doris JACOBSON, Plaintiff,

v.

PITMAN–MOORE, INC., a corporation, and Johnson & Johnson, Inc., a corporation, Defendants.

Civ. No. 4–82–1186.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 20, 1985.

Karla R. Wahl, Minneapolis, Minn., for plaintiff.

Marion C. Haney, Vedder, Price, Kaufman & Kammholz, Chicago, Ill. and Rebecca Palmer and Howard B. Tarkow, Maslon, Edelman, Borman & Brand, Minneapolis, Minn., for defendants.

MacLAUGHLIN, District Judge.

This matter is before the Court on an order of remand from the United States Court of Appeals for the Eighth Circuit. This Memorandum incorporates the Court's findings of fact and conclusions of law.

## BACKGROUND

Plaintiff Doris Jacobson was formerly an employee of defendant Pitman-Moore, Inc.

(PMI), which is a subsidiary of defendant Johnson & Johnson, Inc. Plaintiff worked for PMI from March 13, 1972, until April of 1981 when PMI terminated her employment. Plaintiff was 49 years old at the time of the termination. The facts surrounding the termination are more fully set out in *Jacobson v. Pitman-Moore, Inc.*, 573 F.Supp. 565, 566–67 (D.Minn.1983).

Plaintiff filed this action on September 2, 1982, the same day she filed discrimination charges with the Minnesota Human Rights Commission and the Equal Employment Opportunity Commission (EEOC). Plaintiff's civil action contained eight counts, each setting forth a separate theory assailing the termination. In an order dated January 21, 1983, the Court dismissed all of plaintiff's counts except for her claims under the Equal Pay Act, 29 U.S.C. § 206, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–34. On October 24, 1983, the Court granted defendants' motion for summary judgment on plaintiff's Equal Pay Act claim, but denied defendants' motion as it pertained to plaintiff's ADEA claim. *Jacobson*, 573 F.Supp. at 570.

The case went to trial in November of 1983 on plaintiff's ADEA claim, and the jury found in favor of plaintiff. The Court entered judgment on the jury verdict on January 17, 1984. Subsequently, defendants moved for judgment notwithstanding the verdict or, alternatively, a new trial. The Court denied this motion in an order dated March 12, 1984. *Jacobson v. Pitman-Moore, Inc.*, 582 F.Supp. 169, (D.Minn.1984). Defendants appealed the Court's March 12, 1984 order and January 17, 1984 entry of judgment.

In an order dated March 28, 1985, the Eighth Circuit remanded for further factual findings regarding "the nature of the attorney-client relationship between" plaintiff and Bruce Johnson, the first attorney plaintiff consulted regarding the termination of her employment. The Eighth Circuit further directed the Court to make conclusions of law regarding the appropriateness of tolling the ADEA's statute of

limitations in light of the factual findings regarding the attorney-client relationship between plaintiff and Johnson. The parties proceeded to conduct additional discovery on this issue, and they submitted deposition transcripts and legal memorandum to the Court.

## FACTS

Plaintiff first contemplated filing a lawsuit against PMI the day PMI called to inform her of her discharge. Jacobson 5, 26.[1] In May of 1981, approximately one month after PMI terminated plaintiff's employment, plaintiff decided to contact an attorney regarding her discharge. *Id.* at 4. Plaintiff obtained the name of attorney Bruce Johnson from an acquaintance of hers. In June of 1981, plaintiff called Johnson to set up an appointment. During the phone conversation, plaintiff explained to Johnson how her discharge had come about, and Johnson told plaintiff to meet with him to discuss the situation.[2] This telephone conversation lasted approximately four minutes. *Id.* at 7–8.

A day or two later, plaintiff met with Johnson in his office. Jacobson 7. This was the first time plaintiff had dealt with a lawyer, and she did not know what to expect. *Id.* at 11. At this meeting plaintiff informed Johnson in greater detail about the circumstances of her discharge. Plaintiff further told Johnson that she believed that PMI had discriminated against her on the basis of her age and sex. *Id.* at 9–10.

Plaintiff also told Johnson about her PMI pension booklet (describing her pension rights). Johnson stated that he wanted to look at the booklet, *id.* at 16, and he also told plaintiff to try to get a copy of the complete pension plan and to find out more facts regarding her termination. Johnson 21–22. The meeting between plaintiff and Johnson lasted approximately 15 to 30 minutes. *Id.* at 18; Jacobson 9.

At the conclusion of the meeting, plaintiff's understanding was that Johnson "would look into the matter and let [her] know what had to be done...." Jacobson (June 20, 1985) 14; *see also* Jacobson 15. Plaintiff took it for granted that Johnson would represent her, and she expected to be charged for the initial meeting. *Id.* at 33–34.[3] Johnson did not inform plaintiff about the statute of limitations during this initial meeting. Jacobson (June 20, 1985) 14.

Plaintiff returned to Johnson's office approximately one week after their initial meeting in order to let Johnson review plaintiff's employee benefit booklet. When plaintiff gave Johnson the booklet, plaintiff and Johnson did not engage in a substantive conversation about plaintiff's claims. *See* Jacobson 15–18.[4]

From June of 1981 until July of 1982, the only contact plaintiff had with Johnson involved telephone calls which did not relate to plaintiff's termination of employment.

1. A name followed by a page number denotes a page of a deposition transcript. Unless otherwise noted, reference to Jacobson's deposition are to her July 8, 1985 deposition.

2. Johnson could not recall if the telephone conversation involved anything more than setting up the meeting. Johnson 15. (Unless otherwise stated, references to a Johnson deposition are to his July 8, 1985 deposition.) Based on plaintiff's more detailed memory on this point, the Court finds that the conversation involved more than simply setting up the meeting.

3. Plaintiff testified that "maybe [she] took it for granted" that Johnson would represent her. Jacobson 34. Based on plaintiff's testimony as a whole, the Court finds that plaintiff did expect Johnson to represent her.

4. Johnson states that plaintiff had the booklet with her at their initial meeting and that he asked her to obtain a copy of the complete pension plan. Johnson 17–19. Plaintiff, however, thinks she did not have the booklet with her at the first meeting and she states that she might have brought it to Johnson for his review about a week after their initial meeting. Jacobson 15–17. The differences between plaintiff's and Johnson's recollection is quite understandable considering the passage of time involved. Although she is not positive that she first gave Johnson the pension booklet one week after her initial meeting with Johnson, plaintiff does seem to recall returning to Johnson's office a second time, just to show him a book. *Id.* at 17. Thus, the Court finds that plaintiff did not have the booklet on her initial visit and that she returned one week later to let Johnson look at it.

During this period, plaintiff was working at a roofing company, and her duties included answering the telephone. On two occasions, Johnson called plaintiff's superior at the company and plaintiff answered the phone. Plaintiff exchanged pleasantries with Johnson, but neither party discussed plaintiff's discharge. Plaintiff did not inquire as to the status of Johnson's efforts on her behalf and Johnson made no reference to his progress or activity regarding plaintiff's discharge claims. *See* Jacobson 18–20.

In July of 1982, plaintiff spoke with Robert Hanlin, who was plaintiff's supervisor at PMI. When PMI discharged plaintiff, PMI transferred Hanlin, and he subsequently contacted an attorney. The attorney informed Hanlin about the statute of limitations and Hanlin in turn told plaintiff about it. Plaintiff called Johnson on July 28, 1982 and stated that Hanlin's attorney had informed Hanlin that a statute with a time limit existed. Plaintiff asked Johnson if the time limit applied to her case, but Johnson responded that the time limit had nothing to do with her case. The question concerning the statute of limitations was the extent of the conversation; plaintiff did not inquire as to the status of Johnson's efforts regarding her claims, nor did Johnson offer any such information. Neither person arranged for future contacts. In total, the conversation lasted approximately five minutes. *Id.* at 20–21.

Plaintiff's next contact with Johnson came on August 18, 1982 when he called her and told her to come to his office on August 20, 1982. Plaintiff went to Johnson's office on that date, and there she met for the first time her present attorney, Karla Wahl. Johnson had not told plaintiff that she would be meeting with another attorney, thus plaintiff did not expect another attorney to be present. *Id.* at 21–23.[5] During the meeting between plaintiff, Johnson, and Wahl, it was explained to plaintiff what had to be done in order to bring suit against PMI. *Id.* at 24–25. (Wahl must have done the majority, if not all, of the explaining because Johnson is not experienced in the field of employment discrimination law. *See* Wahl 12.) Wahl explained to plaintiff the need to file a complaint with the appropriate agencies within a certain time. This was the first time anyone had explained the EEOC statute of limitations to plaintiff. Johnson Aug. 29, 1983 aff. ¶ 2. During the August 20 meeting, plaintiff agreed to have Wahl represent her, and plaintiff gave Wahl the go-ahead to commence a lawsuit. Jacobson 28–29.

Plaintiff testified that after this meeting, her understanding was that Johnson "was somebody who found an attorney for me." *Id.* at 29. Plaintiff testified that after the August 20, 1982 meeting, she did not know whether she expected to see Johnson again or whether she expected Johnson to sign pleadings. Plaintiff further testified that after this meeting she did not contact Johnson further because Wahl was handling the matter. *Id.*

Six days later, on August 26, 1982, plaintiff did return to Johnson's office to sign a statement of discrimination for filing with the EEOC. *Id.* at 30; Johnson exh. 10. Plaintiff's only conversation with Johnson was an exchange of pleasantries. *See* Jacobson 30. Wahl was not present during the meeting. *See* Wahl 50. Plaintiff signed the statement of discrimination in Johnson's office because it was easier for plaintiff to travel to Johnson's office than to Wahl's office. Jacobson 30–31.

After August 26, 1982, plaintiff did not have any telephone conversations with

**5.** Johnson testified that he told plaintiff that he would try to obtain a lawyer for her. Johnson 31. Johnson thought this conversation occurred in early August, but the substance of the conversation relates to the conversation plaintiff initiated on July 28, 1982. *See Id.* at 29–30; Jacobson 20–21. Plaintiff's recollection of the July 28, 1982 conversation, however, did not include Johnson's statement about obtaining counsel. *Id.* Furthermore, plaintiff's not expecting to see another attorney at the August 30 meeting is another indication that Johnson did not tell her he was going to locate another lawyer, and the Court finds that Johnson did not make such a comment.

Johnson. *Id.* at 30; 36–37. Neither did plaintiff have any written correspondence with him after that date. (Plaintiff and Johnson did not have any written correspondence before that date either.) *Id.* at 36. During the course of the litigation, however, plaintiff did notice that Johnson's signature appeared on the pleadings. (Wahl would send plaintiff copies of the pleadings.) Plaintiff testified that while she observed Johnson's name on these documents, she "didn't think a whole lot about it." *Id.* at 29. Plaintiff further testified that she was surprised to see Johnson at a motion hearing before the Court because she hadn't talked to him, presumably since August 26, 1982. *Id.* at 32. Although plaintiff did not specify the date of the hearing, it must have been the November 10, 1982 oral argument on defendants' motion to dismiss. *See* Minutes of November 10, 1982 Proceedings (both Wahl and Johnson appeared as counsel for plaintiff).

Johnson testified that he was never plaintiff's attorney in the federal court litigation (*i.e.* the present action). Prior to plaintiff's commencing this action, Johnson considered himself plaintiff's attorney for purposes of finding someone to take her case. Johnson (June 19, 1985) 62–63. Johnson acknowledges, however, that he did do work in connection with plaintiff's federal lawsuit. *Id.* at 8, Johnson 44–46. Johnson states that even though he was working on the case, he was not representing plaintiff. *Id.* at 50–57. Johnson's rationale is that he was an agent or law clerk for Wahl. *See Id.;* Johnson (June 19, 1985) 61–62, 111–12.

Further indications of Johnson's role in the federal court litigation are found in the pleadings and documents of the case. Johnson's name and signature appear on plaintiff's original complaint, and Johnson's name appears on plaintiff's amended and second amended complaints. The Clerk of Court's docket sheet listed Johnson as a counsel of record in this case from its in-

ception, September 2, 1982, until sometime prior to October 24, 1983. *See* October 24, 1983 Clerk's Notice under Fed.R.Civ.P. 77(d) (only lists Wahl as counsel for plaintiff) *but cf.* October 24, 1983 Order (lists Wahl and Johnson as counsel for plaintiff).[6] During this period, Johnson's name appeared on a variety of pleadings and other documents. *E.g.*, Johnson exh. 1A (July 7, 1983 letter from Court's calendar clerk to all counsel of record); plaintiff's June 13, 1983 motion to promulgate more than 50 interrogatories; and plaintiff's December 22, 1982 demand for a jury trial. Wahl testified that she included Johnson's name on the pleadings simply as a courtesy because he had referred the case to her. Wahl 36.

During the course of the litigation, Johnson made two court appearances as plaintiff's counsel. He and Wahl both appeared as plaintiff's counsel at the November 10, 1982 oral argument on defendant's motion to dismiss. *See* Minutes of November 10, 1982 Proceedings. Johnson, moreover, was the only attorney who appeared on behalf of plaintiff at the December 21, 1982 pretrial conference before the United States Magistrate. *See* Minutes of Pretrial Conference; Pretrial Schedule, December 21, 1982 Order of U.S. Magistrate. Finally, an affidavit sworn to by Wahl herself referred to Johnson as "plaintiff's counsel." Wahl August 9, 1983 aff. ¶ 3.

## DISCUSSION

In previously concluding that the EEOC statute of limitations should be equitably tolled, the Court essentially relied on three bases. *See Jacobson*, 573 F.Supp. at 569–70. One of the equitable factors supporting tolling was that plaintiff's untimely filing did not prejudice the defendants. *Jacobson*, 573 F.Supp. at 570. Subsequent to the Court's decision, though, the Eighth Circuit held that the lack of prejudice to the defendant from a late EEOC filing did not justify equitable tolling of the EEOC statute of limitations. *Kriegesmann v.*

---

**6.** Johnson never filed with the Clerk of Court any document indicating that he was withdraw-

ing as counsel for plaintiff.

*Barry-Wehmiller Co.,* 739 F.2d 357, 359 (8th Cir.) (per curiam), *cert. denied,* —— U.S. ——, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984). The Court, therefore, can no longer rely on this factor.

■ Another equitable factor the Court originally pointed to was that plaintiff did not sleep on her rights since she sought out an attorney within two months of her discharge. *Jacobson,* 573 F.Supp. at 570. While plaintiff does deserve credit for quickly seeking out an attorney, plaintiff could have been more vigorous in protecting her rights. Obviously, Johnson should have taken the initiative in investigating plaintiff's claims or in contacting plaintiff to see what the delay was in her reporting back to him. (Another possibility would be that Johnson should have quickly told plaintiff that he declined to represent her.) Nevertheless, even a person inexperienced in dealing with lawyers, such as plaintiff, would have to wonder why an attorney looking into her case had not contacted her for more than one year. Plaintiff also had two fortuitous opportunities to ask Johnson about the status of her case when Johnson called the roofing company to speak with plaintiff's superior. When plaintiff answered these phone calls, she could have easily inquired into the status of Johnson's efforts on her behalf, but she did not. Again, Johnson should have taken the initiative as far as pursuing the case (or clarifying that he would not be pursuing it), but plaintiff's conduct indicates that she could have done much more to protect her rights.

The final basis for the Court's original decision to equitably toll the statute of limitations was the Court's view that the attorney-client relationship between plaintiff and Johnson was "fleeting and unproductive." *Jacobson,* 573 F.Supp. at 570. Although the Court adheres to its characterization of this attorney-client relationship as unproductive, the Court, based on the additional discovery in this case, no longer views this relationship as fleeting.

■ After her initial meeting with Johnson, plaintiff's understanding was that he would look into the matter of her discharge. In addition, Johnson testified that he told plaintiff to find out more facts about her termination. The clear implication from this evidence is that both plaintiff and Johnson envisioned their attorney-client relationship to go beyond their initial meeting. This conclusion is also supported by plaintiff's returning to Johnson's office one week after the first meeting in order to show Johnson her pension booklet. A further indication that plaintiff and Johnson believed they had an ongoing attorney-client relationship lies in plaintiff's July 28, 1982 telephone call to Johnson. When plaintiff called to ask Johnson if she had to be concerned about a statute of limitations, Johnson responded that it had nothing to do with her case. If Johnson believed that he was not acting as plaintiff's attorney, Johnson logically would not have given plaintiff legal advice and would have clarified the fact that he was not representing plaintiff. *See Togstad v. Vesely, Otto, Miller & Keefe,* 291 N.W.2d 686, 693 (Minn. 1980) (per curiam) (legal advice given in an initial consultation, for which no fee was charged, gave rise to malpractice liability).

Johnson states that prior to plaintiff's filing her federal court action, he was her attorney "for the purpose of finding someone to take [her] case." Johnson (June 19, 1985) 63. Even if the Court could accept this characterization, Johnson delayed terribly in locating other counsel. Furthermore, the Court finds that both plaintiff and Johnson understood that Johnson would further look into the circumstances of plaintiff's discharge. Thus, an attorney-client relationship, albeit an unproductive one, existed between plaintiff and Johnson from June of 1981 until at least August 20, 1982. *Cf. Togstad,* 291 N.W.2d at 693 (attorney advising plaintiff that no claim existed, but that he would call her back if he changed his opinion after he consulted with his partner, constituted attorney-client relationship). During this time period, the EEOC filing deadline passed. (February of 1982 is 300 days after April of 1981.)

■ Johnson also acknowledges working on plaintiff's federal lawsuit after

plaintiff filed it on September 2, 1982, but he nevertheless maintains that he did not represent plaintiff because he was merely working as an agent or law clerk for Wahl. This characterization, however, is clearly inaccurate. Johnson was a counsel of record in the federal litigation from its inception on September 2, 1982, until sometime shortly prior to October 24, 1983. The Court cannot accept Wahl's claim that she merely put Johnson's name on pleadings as a courtesy. Not only does Johnson's name appear on all three versions of plaintiff's complaint and a variety of other court documents, Johnson signed plaintiff's original complaint. By signing the complaint, Johnson certified that he was representing plaintiff (and that good grounds supported the complaint). See Fed.R.Civ.P. 11, 28 U.S.C. Appendix (1982).[7] Johnson, moreover, made two court appearances as plaintiff's counsel, and in one of these, he was the only attorney appearing on plaintiff's behalf. Wahl herself even referred to Johnson as "plaintiff's counsel" in an August 9, 1983 affidavit. Finally, plaintiff was aware that Johnson's name appeared on pleadings and other documents. The Court, therefore, finds that Johnson was acting as an attorney representing plaintiff up until October 24, 1983.

■ This conclusion directly impacts upon the decision to toll the EEOC statute of limitations. The Court previously observed that cases tend to use a plaintiff's consultation with an attorney as a basis for imputing constructive knowledge of the EEOC filing deadlines only when the attorney-client relationship spanned over some significant period of time. *Jacobson,* 573 F.Supp. at 569. While the attorney-client relationship between plaintiff and Johnson from June of 1981 until August of 1982 was unproductive, it was an attorney-client relationship of a significant duration. Johnson, moreover, continued to represent plaintiff until sometime shortly prior to October 23, 1983. The length of this attorney-client relationship, therefore, causes this case to fall within the line of cases where an attorney-client relationship of some duration results in a plaintiff having constructive knowledge of the EEOC filing requirements. *See, e.g., Keyse v. California Texas Oil Corp.,* 590 F.2d 45, 47 n. 2 (2d Cir.1978) (per curiam).

■ The result of negating plaintiff's ADEA claim because of the failings of an attorney is, no doubt, harsh. Still, defendant is not responsible for attorney Johnson's conduct. *See Edwards v. Kaiser Aluminum & Chemical Sales, Inc.,* 515 F.2d 1195, 1200 n. 8 (5th Cir.1975); *Gutierrez v. Mofid,* 39 Cal.3d 892, 218 Cal.Rptr. 313, 705 P.2d 886, 890–91 (1985) (en banc). Plaintiff's recourse may well be a legal malpractice action against Johnson. *See Togstad,* 291 N.W.2d at 693; *Gutierrez,* 705 P.2d at 891. The Court reluctantly concludes that a tolling of the statute of limitations is inappropriate in the case at bar.

**CONCLUSIONS OF LAW**

Based on the new evidence submitted, the Court has determined that the EEOC filing requirement was not equitably tolled. The Court concludes that defendant's motion for summary judgment should be granted.

■

---

7. The current version of Fed.R.Civ.P. 11 was not in effect when Johnson signed plaintiff's complaint, but the previous codification of the rule still supports the conclusion that Johnson's signature denotes that he was representing plaintiff:

> Every pleading of a party represented by an attorney shall be signed by at least one attorney of record.... The signature of an attorney constitutes a certificate by him that he has read the pleading ... and belie[ves] there is good ground to support it; and that it is not interposed for delay.

Fed.R.Civ.P. 11, 28 U.S.C. Appendix (1982).